IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

|  |  |  |
|---|---|---|
| JOHN DOE | ) | CASE NO. |
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) | JUDGE |
| v. | ) |  |
|  | ) |  |
| THE UNIVERSITY OF TOLEDO | ) |  |
| c/o Office of Legal Affairs | ) |  |
| 2801 Bancroft Street, Mail Stop 943 | ) |  |
| Toledo, Ohio 43606 | ) |  |
|  | ) |  |
| and | ) |  |
|  | ) |  |
| ASHLEIGH J. WADE | ) |  |
| Associate Dean of Students & Director | ) |  |
| The University of Toledo | ) |  |
| c/o Office of Legal Affairs | ) |  |
| 2801 W. Bancroft St., Mail Stop 943 | ) |  |
| Toledo, Ohio 43606 | ) |  |
|  | ) |  |
| and | ) |  |
|  | ) |  |
| DONALD KAMM | ) |  |
| Director, Title IX and Compliance | ) |  |
| The University of Toledo | ) |  |
| c/o Office of Legal Affairs | ) |  |
| 2801 W. Bancroft St., Mail Stop 943 | ) |  |
| Toledo, Ohio 43606 | ) |  |
|  | ) |  |
| and | ) |  |
|  | ) |  |
| KATRINA NOTTKE | ) |  |
| Assistant Director, Title IX and | ) |  |
| Compliance | ) |  |
| The University of Toledo | ) |  |
| c/o Office of Legal Affairs | ) |  |
| 2801 W. Bancroft St., Mail Stop 943 | ) |  |
| Toledo, Ohio 43606 | ) |  |
|  | ) |  |

{K0689899.2}

|  | )  |
| and | ) |
|  | ) |
| MICHELE SOLIZ, Ph.D. | ) |
| Assistant VP for Student Success and | ) |
| Inclusion | ) |
| The University of Toledo | ) |
| c/o Office of Legal Affairs | ) |
| 2801 W. Bancroft St., Mail Stop 943 | ) |
| Toledo, Ohio 43606, | ) |
|  | ) |
| Defendants. | |

## VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF (JURY DEMAND ENDORSED HEREON)

Plaintiff John Doe,[1] by and through counsel, for his Verified Complaint against The University of Toledo and, in their official capacities, Ashleigh J. Wade, Katrina Nottke, Donald Kamm and Dr. Michele Soliz (collectively, "Defendants") states as follows:

## **INTRODUCTION**

1.     This action concerns Defendant The University of Toledo's ("UT") decision to subject Plaintiff John Doe ("John Doe") to a second biased and unlawful Title IX hearing that it intends to conduct on October 19, 2018. UT set this hearing after its decision of yesterday to vacate its unlawful suspension of John Doe, which was done without due process of law.

2.     On April 2, 2018, UT informed John Doe that he was being investigated by the school for allegations that he committed sexual misconduct,

---

[1] Simultaneously with the filing of this Verified Complaint, John Doe is filing a Motion to Proceed under Pseudonym to protect the identity of students.

sexual assault, harassment and sexual harassment. The notice did not describe the conduct that would form the basis of the investigation.

3.      In the wake of bad publicity and threats from the federal government to withhold funding if universities do not address "sexual misconduct," campuses have over-corrected. These universities, including UT, have instituted biased and unequal policies, procedures and investigations that often result in prejudicial hearings and disproportionate outcomes. Students are presumed guilty, disciplined on a mere preponderance of the evidence and, as in the case of John Doe, denied the right to confront and cross-examine their accusers and other witnesses.

4.      As more fully set forth in this Verified Complaint, UT's biased, unfair, and prejudicial system had led to the two-year suspension of John Doe, a student who UT found to have violated UT's policies based on little more than an uncorroborated statement to an investigator.

5.      However, at the last moment, and just prior to the filing of this Complaint, UT informed John Doe that it has now vacated its decision to suspend John Doe and notified him that UT intends to provide John Doe with a second hearing.

6.      By agreeing to vacate its decision and to conduct a second hearing, UT has acknowledged (overtly if not tacitly) that it violated John Doe's due process rights.

7.     But UT's last minute decision is too little, too late—John Doe's constitutional rights were violated, he has suffered damages and UT plans to subject John Doe to a second, biased and unlawful hearing.

8.     Already, John Doe has been unable to enroll as a student at UT for the fall 2018 semester; he has lost educational, career and business opportunities, incurred litigation expenses, and suffered mental and emotional distress.

9.     But now UT plans to subject John Doe to this ordeal a second time. UT has set a new hearing for October 19, 2018. Absent injunctive relief, John Doe will be subject to harassment, gender bias, and his rights under Title IX will be violated at the scheduled re-hearing.

## **<u>PARTIES</u>**

10.     John Doe, until his unlawful suspension, was an undergraduate student in good standing at UT. Despite the fact John Doe's suspension has been vacated, he is unable to enroll at UT for the fall semester. John Doe is resident of Ohio.

11.     Defendant UT is a public university and has been a member of the state university system since 1967. UT's principal place of business is in Toledo, Ohio.

12.     Defendant Ashleigh Wade ("Wade") is UT's Associate Dean of Students & Director at UT. Wade issued the sanction suspending John Doe from UT. Upon information and belief, Wade is a resident of Ohio.

13.    Defendant Donald Kamm ("Kamm") is the Director, Title IX and Compliance at UT. Kamm supervised the investigation of the allegations contained in the Title IX complaint. Upon information and belief, Kamm is a resident of Ohio.

14.    Defendant Katrina Nottke ("Nottke") is the Assistant Director, Title IX and Compliance at UT. Nottke investigated the allegations contained in the Title IX complaint. Upon information and belief, Nottke is a resident of Ohio.

15.    Defendant Dr. Michele Soliz ("Soliz") is the Assistant Vice President for Student Success and Inclusion at UT.  Upon information and belief, Soliz is a resident of Ohio.

16.    Upon information and belief, Wade, Kamm, Nottke and Soliz acted under color of State law, the regulations set forth in the Ohio Administrative Code and the policies, procedure and practices of UT.

17.    Upon information and belief, one or more of the defendants have the authority to grant the injunctive relief sought in this Complaint.

## JURISDICTION AND VENUE

18.    This Court has jurisdiction over the subject matter of this action: (i) under 28 U.S.C. §§ 1331 and 1343 because this action arises, in part, under the Constitution and laws of the United States—the Fifth and Fourteenth Amendment of the United States Constitution, 42 U.S.C. §1983, and Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. §§ 1681 *et seq.*; and (ii) pursuant to the principles of supplemental jurisdiction under 27 U.S.C. § 1367.

19.     This Court has personal jurisdiction over the Defendants as they are domiciled in and/or conduct business in the State of Ohio.

20.     This Court is authorized to grant the declaratory relief sought under 28 U.S.C. §§ 2201 and 2202 and Fed. R. Civ. P. 57 and 65.

21.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

## BACKGROUND FACTS

22.     On April 11, 2011, The United States Department of Education's ("DOE") Office of Civil Rights ("OCR") issued its now infamous "Dear Colleague Letter," which instructed how universities must investigate and resolve complaints of sexual misconduct under Title IX.  ("2011 Dear Colleague Letter" available at https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.html).[2] This letter manifests direct evidence of gender bias, in part, by equating complainants in sexual misconduct proceedings as females who must receive preferential treatment. For instance, the 2011 Dear Colleague Letter:

   a.     Incorrectly[3] states that "1 in 5 women are victims of completed or attempted sexual assault while in college…[t]he department is deeply concerned about this problem…" 2011 Dear Colleague Letter at 2;

---

[2] The 2011 Dear Colleague Letter has been rescinded, and OCR issued a "new interim Q&A" for schools. *See* "Q&A on Campus Sexual Misconduct," https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf (last visited Sept. 7, 2018). However, schools continue to enforce the policies and procedures instituted in response to the 2011 Dear Colleague Letter.

[3] A report issued by The American Association of University Women noted that over 90% of the colleges and universities in the United States reported that none of their students were raped in 2014. *See* American Association of University Women, 91 Percent of Colleges Reported Zero Instances of Rape in 2014,(Nov. 23, 2015).  In addition, academics conducting a research study found that approximately 50% of sexual assault allegations at two Midwestern American colleges were false.  *See* Eugene J. Kanin, False Rape Allegations, Archives of Sexual Behavior, Vol. 23, No.1 (1994).

b. Warns that "the majority of sexual assaults occur when women are incapacitated, primarily by alcohol." *Id.*

c. Suggests that educational institutions seek grants from the U.S. Department of Justice's Office on Violence Against Women which requires institutions to "develop victim service programs and campus policies that ensure victim safety, [and] offender accountability…" *Id.* at 19;

d. Warns educational institutions that they must "never" view the "victim at fault for sexual violence" if she has been using "alcohol or drugs." In fact, OCR asks "schools to consider" providing students who violate alcohol or drug policies with amnesty if they allege they were sexually assaulted while consuming alcohol or drugs. *Id.* at 15.; and

e. Requires that educational institutions "minimize the burden on the complainant." *Id.* at 15-16.

23. Due to OCR's threat to withhold federal educational dollars if colleges and universities did not address "sexual violence" on their campuses, colleges and universities have rushed to adjudicate these matters, resulting in unfair adjudications of guilt.

24. Universities are educational institutions, designed to educate America's youth. They are ill-equipped to handle and adjudicate matters of sexual assault.

25. Despite a change in presidential administrations, universities remain wary of bad publicity and continue to overreact given the possibility of federal investigations and sanctions, in addition to lawsuits.

26. As a result, these schools have become quasi-criminal investigators and have institutionalized unfair procedures that lead to unreasonable punishments doled out to students accused of misconduct.

7

27.     UT is no exception.

28.     Upon information and belief, UT has engaged in a pattern and practice of violating accused students' rights due to these fears.

29.     Indeed, UT was the subject of a number of dramatic "sexual assault" headlines and received criticism for its former policies and procedures.

30.     UT has been publicly criticized for imposing "flimsy punishments." A review of headlines is illustrative:

   a. *UCSB, University of Toledo Accused of Handing Out Flimsy Punishments for Rape*, Tyler Kingdake, HUFFPOST, https://www.huffingtonpost.com/2014/09/03/uc-santa-barbara-rape_n_5754302.html (last visited Sept. 7, 2018);

   b. *University of Toledo among several colleges accused in sex assault complaint*. WTOL, 2014 http://www.wtol.com/story/26439654/university-of-toledo-among-several-colleges-accused-in-sex-assault-complaint (last visited Sept. 7, 2018);

   c. *Special Report: Student rape victim says University of Toledo mishandled her case*. WTOL, 2014, available at http://www.wtol.com/story/26442335/student-rape-victim-says-university-of-toledo-botched-the-handling-of-her-case (last visited Sept. 7, 2018);

   d. *UT task force suggests expanding sexual misconduct education*, THE BLADE, (Aug. 14, 2017) http://www.toledoblade.com/local/2017/08/14/university-of-toledo-task-force-recommends-expanding-sexual-misconduct-education.html

31.     In light of these fears, colleges and universities, like UT, have engaged in gender bias and instituted limited procedural protections in violation of due process rights to the accused male students, like John Doe, in "sexual misconduct" cases.

**UT's Policies & Procedures**

8

32.    In accordance with Title IX, UT has adopted certain policies and procedures for the investigation and adjudication of alleged sexual misconduct.

33.    Specifically, UT adopts and annually updates: (i) "The University of Toledo's Title IX Policy" (the "Title IX Policy"); and (ii) "The Student Code of Conduct" (the "Student Code"). A copy of the Title IX Policy is attached as Exhibit 1 and the Student Code is attached as Exhibit 2.

34.    Section I(G)(5) of the Title IX Policy (which was renamed in August 2018 the "Sexual Misconduct Policy") provides "***Witnesses and evidence.*** The parties have an equal opportunity to present witnesses and evidence during the investigation of sexual misconduct complaints." (emphasis in original).

35.    The Student Code provides, under Section G(11)(g), entitled "Hearing Procedures," that "the complainant (if applicable) will provide the hearing authority with a summary of their role, and a statement of what happened from their perspective. The hearing authority and ***respondent*** will ask questions of the complainant." (emphasis added).

36.    However, even these limited procedural protections, enshrined in both the Title IX Policy and the Student Code, were violated during John Doe's disciplinary hearing. As more fully set forth below, John Doe's accuser—Jane Roe, the complainant—did not attend John Doe's hearing.

37.    The Student Code governs the adjudication and resolution of sexual misconduct allegations when a student is accused of "sexual misconduct" as defined

in the Title IX policy. *See* Title IX Policy at (G)(3)(a). The Student Code provides

that a student may be subject to disciplinary action for a variety of behaviors.

38.     John Doe was charged with violations of the following provisions of the

Student Code:

- (E)(1)(a) – "Behavior causing physical injury/harm to others";
- (E)(1)(c) – "Behavior that is threatening or intimidating";
- (E)(2)(b) – "Sexual Assault: Unwelcome physical conduct of a sexual nature, including unwanted kissing, touching, oral, vaginal, or anal sex, which occurs in the absence of consent. This includes penetration, no matter how slight, of the vagina or anus with any body part, or any object, or oral penetration by a sex organ of another person, without consent.
- (E)(2)(c) - Sexual Harassment: Unwelcome conduct of a sexual nature. It includes unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature. Sexual harassment can occur as hostile environment or quid pro quo.
- (E)(3) – Harassment: Unwelcome conduct against another individual based upon a protected category that is so severe, pervasive or offensive, it substantially interferes with the ability of a person to work, learn, live, participate in, or benefit from the services, activities or privileges provided by the University.
- (E)(9)(a) – Underage possession/consumption of alcoholic beverages before his/her 21st birthday

39.     The burden of proof in any adjudication of a violation of the Student

Code is the preponderance of the evidence. *See* Student Code at (G)(7)(a).

40.     Sanctions for violations of the Student Code range in severity and

include the following:

- Written warning
- Probation without restrictions(s);
- Probation with restriction(s);
- Suspension;
- Permanent expulsion;
- Educational actions; and
- Restrictions of privileges.

**The March 2018 Incident**

41.     John Doe was suspended[4] from UT for two years for events that allegedly occurred during the early morning hours of March 10, 2018.

42.     John Doe and non-party Jane Roe ("Jane Roe") were friends who previously contemplated dating. They met in January 2018 through their membership in UT Greek life.

43.     On Friday March 9, 2018, John Doe had just returned from spring break in Tampa, Florida. During this trip, he exchanged text messages with Jane Roe.

44.     John Doe had driven the entire way from Florida to Ohio, and he had little sleep.

45.     Cajoled by his fraternity brothers to "party," John Doe admitted to drinking one and a quarter "Four Lokos" the night of March 9, 2018.

46.     On Friday, March 9, 2018, it was still spring break at UT and many students had not yet returned to campus. John Doe was hungry and wanted a ride to get some food.

47.     At approximately 1:36 AM on March 10, 2018, John Doe texted Jane Roe and one other person, asking "sober and in Toledo"?

48.     Jane Roe responded to the text message almost immediately (according to John Doe, after four minutes) and John Doe requested that Jane Roe drive him to Taco Bell.

---

[4] On September 25, 2018, John Doe was informed that this suspension had been vacated, see paragraphs 129 through 140, *infra*.

49.     Jane Roe picked up John Doe at his fraternity house at approximately 1:44 AM and they proceeded to go to the Taco Bell drive-through.

50.     From here, Jane Roe's and John Doe's versions of the night's events dramatically diverge.

51.     According to John Doe, he ordered food and they proceeded back to campus, where he ate one taco in the car while Jane Roe sat in the driver's seat.

52.     While in the car, John Doe asked Jane Roe whether she was being thrown out of her sorority house for fighting with her sorority sisters.  John Doe's question upset Jane Roe.

53.     Jane Roe exited the car, and John Doe followed her into his fraternity house.

54.     John Doe walked behind Jane Roe because his toe was sore from an injury that occurred during his spring break trip.

55.     John Doe was annoyed that Jane Roe did not open the door for him, as his foot was injured and he was carrying food and a drink. Thereafter, the two parted ways.

56.     John Doe returned to his room, ate more food, texted Jane Roe (who did not respond) and fell asleep on the couch in his room around 3:00 AM.

57.     Jane Roe's recitations to UT investigators of the early morning events are different.

58.     According to Jane Roe, when she was in the drive-through lane with John Doe at Taco Bell, John Doe "grabbed her thigh with a lot of force," with such force that "it hurt and caused bruising."

59.     Then, after Jane Roe parked her car at the fraternity house, she claimed that John Doe "bear hugged" her and told her, "You didn't think I was this strong did you? You need to tell me your problems, I can fix you." Thereafter, Jane Roe alleged that she "started screaming at [John Doe] to get out of the car – multiple times."

60.     Jane Roe also alleged that John Doe "grabbed her neck/face with one hand" and told Jane Doe she was "so fucking disrespectful for not waiting for him and holding the door."

61.     In e-mail responses, Jane Roe further elaborated that John Doe pushed her against the door to his bedroom at the fraternity house.

62.     There were no witnesses to the alleged grabbing and pushing by John Doe.

63.     It is also unclear when this alleged grabbing and pushing occurred.

64.     One witness, who was John Doe's roommate and in the bedroom at the time of the alleged incident, told investigators that Jane Roe entered John Doe's room shortly upon returning from Taco Bell.  This witness reported that nothing appeared out of the ordinary and that there "was no reason to believe that anything happened between [John Doe] and [Jane Roe] near the doorway of the bedroom while they were talking."

65.     Another witness reported that Jane Roe told her that John Doe grabbed her, but that she did not provide any other details about being grabbed.

66.     On March 18, 2018, Jane Roe reported the incident to the UT Police Department. A copy of the redacted report is attached hereto as Exhibit 3.

67.     The recitation of facts by Jane Roe in the police report contain discrepancies from what is contained in the statement Jane Roe reported to Kamm on March 26, 2018.

68.     For example, in the police report, Jane Roe reports that John Doe grabbed her "on their way to Taco Bell." This account differs from her other statement that John Doe grabbed her leg in the drive-through.

69.     Likewise, Jane Roe informs the UT Police that she ran out of the fraternity house right after John Doe pushed her against a door. However, other witnesses report that Jane Roe went up to the third floor and reported the incident to her friend, John Doe's roommate.

70.     With such different accounts of the events during the early morning hours of March 10, 2018, the credibility of Jane Roe was at issue and, at the hearing, UT's panel was presented with the choice of competing narratives—John Doe's and Jane Roe's—in order to resolve the case.

### UT's Biased "Title IX Report"

71.     Prior to conducting a hearing on whether John Doe violated the Student Code as a result of the alleged incident the morning of March 10, 2018, UT engaged in a Title IX investigation and completed a report (the "Title IX Report").

14

72. UT's investigators conducted an investigation in April and May of 2018.

73. The Title IX Report was provided to John Doe on May 18, 2018.

74. The Title IX Report contained numerous examples of gender bias.

75. The Title IX Report presumed that Jane Roe's versions of events were true, even though the UT investigators were unable to corroborate Jane Roe's account of John Doe grabbing her by the throat. The report noted that "there were no witnesses to this event."

76. Indeed, one witness told investigators that Jane Roe reported to him that "[Jane Roe] told him [John Doe] grabbed her face and shook her head side to side and screamed at her." But this witness also told investigators that "if there was any screaming … that he would have heard it and come running to help."

77. Interview notes from another witness stated that "there was no reason for him to believe that anything happened between [John Doe] and [Jane Roe] near the doorway of the bedroom while they were talking."

78. Also, UT never endeavored to reconcile the discrepancies from Jane Roe's interview with the UT Police versus Jane Roe's interview with UT's Title IX office.

79. The Title IX Report presumed John Doe's guilt.

80. Nottke's interview notes from her interview of John Doe contained evidence of bias, and UT's presumption of his guilt.

81.     For example, Nottke wrote that "[John Doe] reports he does not remember grabbing [Jane Roe's] right thigh" and that "[John Doe] reports that he does not remember grabbing [Jane Roe] by the neck and jaw.... He reports he does not recall this incident at all."

82.     Further, Nottke wrote that "he reports he has no explanation for not remembering the incident other than a combination of being tired from driving all night from Tampa, Florida then drinking the 24 ounce can of Four Loko and about a quarter of a can of the same thing."

83.     From these interview notes, it is apparent that Nottke presumed that the incident took place as reported by Jane Roe and that John Doe simply did not "remember" the incident—not that the incident did not happen.

84.     However, Nottke was aware that John Doe had previously denied the incident and that "the executive board of the fraternity had a meeting with [John Doe] about the alleged incident. [John Doe] denied all of the allegations."

85.     Additionally, photographs of Jane Roe's thigh was included as part of the Title IX Report; however, the photographs were never authenticated in the report or during the hearing.

86.     The Title IX Report did not detail when the photographs were taken, who took the photographs and, as Jane Roe's face is not visible in the pictures, it is unknown whether it is even Jane Roe's thigh.

87.     The Title IX investigator interviewed Jane Roe multiple times. In a follow up interview, the Title IX investigator failed to ask Jane Roe any questions concerning the photograph.

88.     The photographs in the Title IX Report were not time-stamped and no information concerning when it was taken was included in the Title IX Report.

89.     Upon information and belief, UT did not request metadata or other electronically stored information from Jane Roe that would have authenticated when the photograph was taken.

90.     There are further glaring errors and omissions in the Title IX Report.

91.     These errors and omissions evidence that UT conducted an investigation biased against John Doe and that presumed his guilt.

92.     On May 25, 2018, Wade informed John Doe that there would be a Title IX hearing through UT's Office of Community Standards and informed John Doe of the alleged violations – Sections (E)(1)(a), (E)(1)(c), (E)(2)(b), (E)(2)(c) and (E)(9)(a)[5] of the Student Code.

93.     On or about June 11, 2018, John Doe and his father met with Wade.

94.     At this meeting, John Doe was not afforded an opportunity to discuss the charges in any meaningful way with Wade.

95.     During the meeting, John Doe and his father did inquire of Wade whether Jane Roe would be present at the hearing.  Wade responded that she assumed Jane Roe would not appear because she had been difficult to reach.

---

[5] (E)(9)(a) is underage possession and consumption of alcohol.

96.     Further complicating matters, the night before John Doe's hearing occurred, at approximately 9:00 PM on July 23, 2018, Wade called John Doe and informed him of additional evidence that Jane Roe had submitted in June 2018. This evidence had not been previously provided to John Doe.

### UT Conducts a Hearing Where Jane Roe does Not Appear

97.     On July 24, 2018, the Title IX Board of UT conducted a hearing to determine whether John Doe violated UT's Code of Conduct (the "Hearing").

98.     The Hearing lasted only approximately 90 minutes.

99.     Jane Roe did not appear at the Hearing, even though her credibility was at stake in John Doe's case.

100.    John Doe was not provided an opportunity to confront and question Jane Roe about the events of March 9, 2018.

101.    John Doe's Hearing was recorded and a hearing tape exists.

102.    UT has refused to provide a copy of the transcript of the Hearing to John Doe and his counsel. While UT indicated John Doe could listen to the Hearing tape, it would not provide him with a copy and would not allow John Doe's counsel to listen to or possess a copy of the transcript.

### UT Finds John Doe Violated the Student Code and Suspends John Doe for Two Years

103.    One week later, on July 31, 2018, UT provided John Doe with its decision. A redacted copy of the decision is attached as Exhibit 4.

104.    In its decision, UT found that John Doe was responsible for violating the following sections of the Student Code: (i) (E)(1)(a) Behavior causing physical

18

injury/harm to others; (ii) (E)(1)(c) Behavior that is threatening or intimidating; (iii) (E)(2)(b) Sexual Assault; (iv) (E)(2)(c) Sexual Harassment; and (v) (E)(9)(a) Underage possession/consumption of alcoholic beverages for his/her 21st birthday.

105.    UT found that John Doe was <u>not</u> responsible for violating (E)(3) – Harassment.

106.    UT never justified how it could find John Doe responsible for Sexual Harassment when it determined that John Doe was not responsible for the lesser offense of Harassment.

107.    UT sanctioned John Doe for these violations as follows: (i) a two-year suspension from the university; (ii) a two-year no-contact order with Jane Roe; (iii) alcohol counseling and sanctions, with corresponding fees totaling $50; (iv) an off-campus counseling requirement concerning decision making and "suicidal ideations"; (v) a Title IX reflection paper requirement; (vi) a $30 fine; and (vii) an additional $25 administrative fee.

108.    In making its finding, UT relied solely on its biased investigation and its investigators conversations with Jane Roe, despite the differences in her statements to police and Title IX investigators.

109.    UT did not make its findings based on any testimony given by Jane Roe during the Hearing because, again, Jane Roe was absent.

110.    Instead, UT believed Jane Roe's narrative of events when finding that John Doe violated UT's Student Code.

111.   In rationalizing its decision, UT made a number of impermissible findings.

112.   First, UT impermissibly found that: "there were bruises on [Jane Roe's] upper thigh the next day that were consistent with a handprint/fingers."

113.   UT made this finding even though there was nothing in the Title IX Report authenticating the photographs as genuine. There was no testimony as to who took the photograph, when the photograph was taken, or even that the photograph depicted Jane Roe's thigh.

114.   Second, UT impermissibly found that: "[Jane Roe] reported that you 'grabbed her thigh with a lot of force.'"

115.   UT made this finding based on interview notes.

116.   Third, UT impermissibly found that: "when [Jane Roe] was asked how she responded when you grabbed her thigh, she said you [sic] did not respond for fear you would try to do something else (p. 74 of the Hearing Packet). The Board believes this shows that your actions were unwanted and unwelcome."

117.   Again, UT made this finding based on interview notes with Jane Roe.

118.   UT also failed to rationalize its decision.

119.   First, UT failed to make a rational and reasonable finding that John Doe's action in allegedly touching Jane Roe's thigh was sexual, even though it found John Doe responsible for "sexual assault" and "sexual harassment."

120.   Indeed, UT's decision is devoid of any reasonable conclusion that John Doe's alleged conduct was sexual in nature.

20

121.    Without justification, UT delved in to John Doe's prior sexual history.

122.    UT's decision simply found that John Doe "only touches the thigh(s) of women [he is] talking to and/or dating."

123.    Given these genuine issues of credibility and UT's own rejection of at least part of Jane Roe's narrative, only one conclusion can be reached—that UT's investigatory and hearing process is biased against men and designed to find guilt.

### John Doe Appeals

124.    On August 1, 2018, John Doe file an appeal of UT's decision.

125.    In his appeal, John Doe objected to, among other things: (i) the untimely delivery of evidence, which occurred only one day prior to the Hearing; (ii) the reliance on a photograph that was not authenticated, in any way; (iii) the "sexual" nature of the misconduct ascribed to his behavior; and (iv) Jane Roe's failure to appear and testify at the Hearing.

126.    On August 22, 2018, Defendant Soliz informed John Doe that his appeal had been denied.

127.    As a result of UT's violations of his constitutional rights, and UT's violations of its own policies, John Doe notified UT that he intended to file suit.

128.    UT then made a sudden decision.

### UT Reverses its Decision

129.    On or about August 2018, John Doe retained the undersigned to represent him as a result of UT's violation of his rights.

130.    Undersigned counsel investigated John Doe's claims.

131.    On or about September 25, 2018, undersigned contacted UT to request that UT accept service of process of this Complaint.

132.    Later that day, on September 25, 2018, undersigned counsel learned that UT had decided to vacate its prior decision suspending John Doe from UT. UT further informed the undersigned that it was planning to hold a new hearing.

133.    Accordingly, UT, by its actions, has admitted to violating John Doe's constitutional rights.

134.    On September 25, 2018, UT sent John Doe correspondence via e-mail notifying him of its decision to vacate its findings and sanctions and informed him that a new hearing will occur on October 19, 2018 at 9:00 AM. A redacted copy of that correspondence is attached as Exhibit 5.

135.    UT re-set John Doe's hearing for October 19, 2018, just a little over three weeks away.

136.    With such little time between its decision to vacate, and the new hearing, upon information and belief, UT is not intending to conduct a new investigation or otherwise correct the glaring gender bias that infected UT's investigation and the Hearing.

137.    UT's sudden decision to vacate its decision does not cure or otherwise compensate John Doe for the damages that he has already incurred.

138.    The fall 2018 semester began on August 27, 2018 and the add/drop period for UT classes expired on September 10, 2018.

139.    As a result of the now-vacated suspension, John Doe was unable to enroll as a student at UT for the fall 2018 semester and he has lost educational, career and business opportunities. John Doe has also incurred litigation expenses, and suffered mental and emotional distress.

## CLAIM ONE
### (Declaratory Judgment –28 U.S.C. §2201–Wade, Kamm, Nottke and Soliz)

140.    Plaintiff restates and re-avers each and every allegation in the preceding paragraphs as if fully restated herein.

141.    As a result of Defendants' actions, there is a substantial and continuing justiciable controversy between the parties concerning John Doe's rights.

142.    The Fifth Amendment to the United States Constitution, made applicable to Ohio by the Fourteenth Amendment, provides that no person shall "be deprived of life, liberty, or property, without due process of law."

143.    The Fourteenth Amendment to the United States Constitution provides that no State shall deprive "any person of life, liberty, or property, without due process of law."

144.    Education is a property interest.

145.    John Doe was entitled to a hearing that included the right to confront and cross-examine his accuser prior the deprivation of his property interest in his education.

146.    John Doe was deprived due process protections.

147.    John Doe has a protected liberty interest in his good name, reputation, honor and integrity which he cannot be deprived of by the state absent due process.

148.    John Doe has a protected liberty interest in pursuing his education at a public university, which the state cannot deprive him of absent due process.

149.    John Doe has a protected liberty interest in his future educational and employment opportunities, which the state cannot deprive him of absent due process.

150.    John Doe is entitled to process commensurate with the seriousness of the allegations and the potential discipline, sanctions, and repercussions he was facing. Here, the allegations are of the utmost seriousness, having lifelong ramifications, and are quasi-criminal in nature.

151.    John Doe has a significant interest in avoiding an adverse decision against him based on a denial of due process protection.

152.    Wade, Kamm, Nottke and Soliz know that John Doe has a clearly established right to due process protections, and a reasonable person would know that failing to apply those standards would violate John Doe's rights.

153.    Providing due process protections imposes no administrative burden.

154.    John Doe is entitled to a declaration that the Student Code and Title IX Policy, as applied to John Doe, violated the Due Process Clauses of the United States Constitution.

## CLAIM TWO
### (42 U.S.C. § 1983 - Wade, Kamm, Nottke and Soliz)

155.    Plaintiff restates and re-avers each and every allegation in the preceding paragraphs as if fully restated herein.

156.  Wade, Kamm, Nottke and Soliz have acted under color of law in violating John Doe's rights under the Fifth and Fourteenth Amendments to the United States Constitution.

157.  Wade, Kamm, Nottke and Soliz have acted intentionally and with callous disregard for John Doe's clearly established constitutional rights.

158.  As a direct and proximate cause of Wade, Kamm, Nottke and Soliz's violation of John Doe's constitutional rights, John Doe, will suffer severe and substantial damages, including, *inter alia*, diminished earnings capacity, lost educational, career and business opportunities, litigation expenses, and mental and emotional distress.

159.  Pursuant to 42 U.S.C. § 1988, John Doe is entitled to his attorney fees incurred in bringing this action.

### CLAIM THREE
**(20 U.S.C. §§ 1681 *et seq.* - UT)**

160.  Plaintiff restates and re-avers each and every allegation in the preceding paragraphs as if fully restated herein.

161.  Title IX provides, in relevant part, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

162.  Title IX is enforceable through an implied right of action affording an individual discriminated against due to his or her gender pecuniary damages and equitable relief.

25

163.   UT's conduct, as described above, discriminated against John Doe, on the basis of his sex, through discriminatory, gender-biased implementation of UT's policies and procedures in the wake of pressure from the OCR, complaints of females, and bad media publicity.

164.   UT's finding that John Doe violated UT's policy on sexual harassment is erroneous in that the university could not reconcile that John Doe did not violate the harassment policy but committed sexual harassment as the outcome is so flawed that it could not occur but for gender bias against John Doe.

165.   UT has failed to remediate its discriminatory actions against John Doe and UT's intended rehearing will only perpetuate the discrimination that John Doe has already suffered.

166.   As a direct and proximate result of UT's act and omissions, as described throughout this Complaint, John Doe has suffered damages.

## CLAIM FOUR
### (Breach of Contract – All Defendants)

167.   Plaintiff restates and re-avers each and every allegation in the preceding paragraphs as if fully restated herein.

168.   John Doe applied for and enrolled at UT and paid tuition and other fees and expenses. He did so in reliance on the understanding, and with the reasonable expectations, among others, that: (a) UT would implement and enforce its policies, including the Student Code and the Title IX Policy, and (b) that the policies would comply with the requirements of applicable law, including Due Process and Title IX.

26

169.    As set forth in the Complaint, Defendants have violated Section G(11)(g) of the Student Code and Section I(G)(5) of the Title IX Policy.

170.    Specifically, UT breached the Student Code because John Doe was, among other things, not provided the opportunity to question the accuser and was unable to present witnesses and evidence.

171.    All of the foregoing breaches of contract were wrongful, without lawful justification or excuse, prejudicial, and were part of an effort to achieve a predetermined result regarding Jane Roe's complaint.

172.    As a direct and proximate cause, John Doe has been damaged in an amount to be proven at trial.

**WHEREFORE,** John Doe respectfully requests that this Court:

(A)    Award damages in an amount to be determined at trial, but in no event less than $75,000.00;

(B)    Enter declaratory judgment that the UT Student Code of Conduct and Title IX policy, as applied to John Doe, violated the Due Process Clauses of the United States Constitution;

(C)    Enter injunctive relief that prevents a re-hearing on the claims against John Doe because the investigation was infected with gender bias and violated the requirements of Title IX;

(D)    Award court costs and other reasonable expenses incurred in maintaining this action, including reasonable attorney fees authorized by 42 U.S.C. § 1988; and

(E)     Award such other relief as this Court may deem just and proper.


Respectfully Submitted,

**KOHRMAN JACKSON & KRANTZ LLP**

*/s/ Susan C. Stone*

SUSAN C. STONE (0064445)
KRISTINA W. SUPLER (0080609)
One Cleveland Center, 29th Floor
1375 East Ninth Street
Cleveland, Ohio 44114-1793
Telephone: (216) 696-8700
Facsimile: (216) 621-6536
Email: scs@kjk.com; kws@kjk.com

*Counsel for John Doe*


## JURY DEMAND

Plaintiffs respectfully demand a trial by jury pursuant to Fed. R. Civ. P. 39.

*/s/ Susan C. Stone*

SUSAN C. STONE

{K069899-2}

## VERIFICATION

I, ▮▮▮▮▮▮▮ being duly sworn, state that I have reviewed the factual allegations contained in this Verified Complaint. I am the John Doe described in the Complaint. I believe that the disclosure of my identify will cause me irreparable harm as this case involves matters of utmost personal intimacy, including education records protected from disclosure by the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. §1232g, 34 CFR Part 99. All of the factual allegations in the Verified Complaint are true and accurate to the best of my knowledge.



Sworn to before me and subscribed in my presence this 25 day of September, 2018.



NOTARY PUBLIC

**MICHAEL METZ**
Notary Public, State of Ohio
My Commission Expires 09-19-2021